## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ALEXANDER CHEN** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:20-cv-01840 (VLB)** |
| **v.** | : | |
| | : | |
| **TRIUMPH ENGINE CONTROL** | : | **March 30, 2023** |
| **SYSTEMS, INC.** | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT [DKTS. 51, 56]

Plaintiff Alexander Chen, born in 1962, worked as an engineer for Defendant Triumph Engine Control Systems, Inc.  After more than six years of satisfactory or better performance reviews, Triumph placed Chen on a performance improvement plan ("PIP") in October 2019.  In December 2019, Chen complained to Human Resources about an age-based comment that he viewed as discriminatory and expressed his concern that his placement on the PIP also constituted age discrimination.  A few weeks later, in January 2020, Chen brought his age discrimination concerns to his supervisors after learning that his complaint had not been escalated.  Triumph terminated his employment February 4, 2020.

Chen asserts Triumph discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the  Connecticut Fair Employment  Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-51, *et seq.*, when it placed him on a PIP and then terminated his employment.  He also claims that Triumph retaliated against him for

complaining about age discrimination, in violation of the ADEA and the CFEPA, when it terminated his employment.  Triumph moves for summary judgment on all claims.   Chen moves for summary judgment on Triumph's tenth affirmative defense—that his damages are limited by the after-acquired evidence doctrine.  For the following reasons, Triumph's summary judgment motion is DENIED and Chen's summary judgment motion is GRANTED.

## I.   FACTUAL BACKGROUND

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties.[1]   The facts are read in the light most favorable to the non-movant, Alexander Chen.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiff Alexander Chen, born in 1962, was hired by Goodrich Engine Control Systems ("Goodrich") as a Principal Engineer in 2009.  (Dkt. 25 (Am. Compl.) ¶ 8; Dkt. 33 (Ans.) ¶ 8; Dkt. 64-1 (Pl.'s 56(a)(2) Stmt.) ¶ 1.)   Defendant Triumph acquired Goodrich and, on February 18, 2013, it offered Chen a position in the Research and Development ("R&D") Department.  (Dkt. 25 ¶ 9; Dkt. 33 ¶ 9; Dkt. 64-1 ¶ 9.)  He was 50 years old at the time.  (*See* Dkt. 64-1 ¶ 1, 9.)  Triumph transferred Chen to Product Support when the R&D Department disbanded.  (Dkt. 64-1 ¶ 9.)

As a Principal Engineer in Product Support, Chen first reported to Dean Anderson, Senior Manager of Mechanical Engineering.  (*Id.* ¶ 7.)  Roger Lapointe,

[1] The Court cites Plaintiff's Local Rule 56(a)(2) Statement for all facts deemed admitted. Otherwise, the Court cites directly to the exhibits or allegations in the operative complaint that have been admitted.

Manager of Hydro Support Engineering, became his direct supervisor in 2017, and Chen reported directly to him for the remainder of his employment.  (*Id.* ¶ 16.)  As of 2018, the engineering team's leadership consisted of the following:  Lapointe reported to Anderson (*id.* ¶ 8); Anderson reported to Wayne Wattley, Director of Hydromechanical Engineering (*id.* ¶ 6); Wattley reported to Mark Lillis, Vice President of Engineering (*id.* ¶ 5); and  Lillis reported to Tony Ziotas, Vice President of Business (*id.* ¶ 4).  All supervisors' ages are within three years of Chen's age and three out of five (Anderson, Lapointe and Lillis) are older than him.  (*See id.* ¶ 4−8.)

Triumph has a Human Resource Guidelines policy.  (*Id.* ¶ 11.)  The policy prohibits harassment with the following language: "The Company does not tolerate inappropriate verbal or physical conduct by any employee that harasses, disrupts, or interferes with another's work performance or that creates an intimidating, offensive, or hostile environment."  (Dkt. 56-17 (Def.'s Mot. Summ. J. Ex. 14, Handbook) at 5.)  It also contains a protocol for adjudicating an employee discrimination complaint:

> All complaints of unlawful discrimination or harassment <u>will be investigated promptly and in as impartial and confidential a manner as possible.</u>  Employees are required to cooperate in any investigation.  A timely resolution of each complaint should be reached and communicated to the parties involved…. The Company <u>prohibits any form of retaliation</u> against employees for <u>bringing bona fide complaints</u>, providing information about harassment or discrimination, or participating in internal investigations.

(*Id.* at 6 (emphases added).)  Chen understood Triumph had policies prohibiting discrimination and retaliation.  (Dkt. 64-1 ¶ 12.)  Lapointe was not aware of this

provision of Triumph's policy. (Dkt. 56-9 (Def.'s Mot. Summ. J. Ex. 6, Lapointe Depo.) at 25:22−26:3.)

Triumph's West Hartford Human Resources Department was led by Tim Daubert, Director. (Dkt. 64-1 ¶ 2.) MaryEllen Mix was a Human Resources Manager in the Human Resources Department and reported directly to Mr. Daubert. (*Id.* ¶ 3.) Both individuals are in Chen's protected class, and Mix is older than Chen.

### A. Chen's Performance

The parties submitted performance reviews spanning 2014 through 2019. Triumph's fiscal year ends at the end of March. (*See, e.g.,* Dkt. 64-8 (Pl.'s Opp'n Ex. 7, 2018 Review) at CHEN000834.)

From 2014 through 2017, supervisors evaluated employees on "Goals and Competencies" using the following four classifications: "Exceptional," "Exceeds Expectations," "Solid Performer," and "In Development or Needs Development." (Dkt. 64-1 ¶ 21.) Chen received an overall "Solid Performer" rating every year. (*See* Dkts. 64-4 (Pl.'s Opp'n Ex. 3, 2014 Review), 64-5 (Pl.'s Opp'n Ex. 4, 2015 Review), 64-6 (Pl.'s Opp'n Ex. 5, 2016 Review), 64-7 (Pl.'s Opp'n Ex. 6, 2017 Review), 64-8 (Pl.'s Opp'n Ex. 7, 2018 Review). As described by Anderson, "Solid Performer" was equivalent to "very good work." (Dkt. 64-5 at CHEN000854.) Each year, Chen received "Exceeds Expectations" or "Solid Performer" in nearly every "Goal and Competency" sub-category. However, he received an "In Development or Needs Improvement" in the following: in 2016, Championing Customer Needs and Communicating Effectively (*see* Dkt. 64-6 at CHEN000847); in 2017, Communicating Effectively and Prioritizing and Organizing Work (*see* Dkt. 64-7 at CHEN000843).

The parties dispute whether fiscal year 2018 was subject to the same annual review standard or whether Triumph changed the standard to a "9 Block" system—Chen contends that the change took place in 2018, and Triumph contends it did not change until 2019. (*See* Dkt. 64-1 ¶ 22.) The 9 Block system reflected three key changes. First, Triumph reduced the number of classifications from four to three and renamed them as: "Exceeds Expectations," "Meets Expectations," and "Needs Improvement." (*Id.*) Second, the evaluator was expected to rank employees with one of these three classifications in both Results and Behavioral competencies, combine these scores, and then place the individual on a one-to-nine block rating scale ("one" being a Needs Improvement in Results and Behavioral competencies, and "nine" being Exceeds Expectations in both competencies). (*See* Dkt. 56-21 (Def.'s Mot. Summ. J. Ex. 18, 2019 Perf. Rev.) at Triumph0000071.) Third, this system required Triumph to evaluate each employee on a bell curve and those who received bottom scores were required to be put on a Performance Improvement Plan ("PIP"). (*See* Dkt. 64-1 ¶ 22.)

Chen's 2018 annual review reflects an evaluation system falling somewhere between the two. Lapointe evaluated Chen on five Goals and seven Competencies (totaling 12 subcategories). (*See* Dkt. 64-8 at CHEN000838.) Lapointe rated Chen an "Exceeds Expectations" or "Solid Performer"—i.e. the former classification system—in every subcategory. (*Id.*) In his 2018 performance review, Chen was rated "Meets Expectations" for both Competencies and Goals, giving him a score of 5 out of 9 on a diagram that appears to be a 9 Block scale. (*See id.*)

5

Lapointe testified about the 2018 performance review. When asked, "[Y]ou would not have given Alex any ratings in this 2018 performance review that he didn't deserve; correct?," Lapointe responded, "Correct." (Dkt. 56-9 at 45:19−22.) Later, Lapointe testified that the Solid Performer ranking he gave Chen in categories of Communicating Effectively, EMC-51 Stepper Motor Testing, and Acting with Integrity were inaccurate. (*Id.* at 47:24−48:7.) He specifically testified that Chen deserved a "Development" ranking for Communicating Effectively. (*Id.* at 49:24−50:2.)

It is undisputed Triumph used the 9 Block review system for fiscal year 2019. (*See* Dkt. 64-1 ¶ 21.) Lapointe gave Chen a Needs Improvement for his Behaviors Rating, giving him Needs Improvement in three subcategories and Meets Expectations in two. (Dkt. 56-21 at Triumph000071.) He also gave Chen a Needs Improvement for his Results Rating, even though he gave Chen Meets Expectations in three out of five of the subcategories. (*Id.*) Specifically, the conduct identifying as Needs Improvement were: (a) for Results, the subcategories of Complete EMC51 Stepper Motor Testing and Test Maryland Products per Request; and (b) for Behavioral Competency, the subcategories of Building Effective Teams, Collaboration/Teamwork, and Communicating Effectively. (*Id.*) During a meeting that lasted 30 minutes to one hour, Chen told Lapointe he disagreed with the review. (*Id.* ¶ 23.) Chen and Lapointe signed the 2019 performance review on June 10, 2019. (Dkt. 56-21.)

Triumph employed an individual named Aslam Zainab between December 17, 2018, and October 25, 2019. (Dkt. 56-15 (Def.'s Mot. Summ. J. Ex. 12, Ramirez

Aff.) ¶ 3.)  At some point during her employment, Chen spoke with her about her citizenship status and eligibility to vote.  (*Id.* ¶ 5.)  Chen describes the incident as follows: "I asked her about if she's going to go vote and then I realized she may be from a foreign country.  So, I said, 'Oh, are you a citizen?' And she said, 'Yeah, I'm a citizen' and I said, 'Are you going to vote?' and she said, 'Yea.'"  (Dkt. 56-4 (Def.'s Mot. Summ. J. Ex. 1, Chen Depo.) at 131:12−132:2.)  Her supervisor, Brooke Ramirez, stated under penalty of perjury that Zainab reported the incident to her, "visibly shaking and upset" and that she left work early that day because of the interaction.  (Dkt. 56-15 ¶ 5.)  Chen denies Zainab was upset or that the conversation was confrontational.  (*See* Dkt. 56-4 at 131:12−136:22.)  The date on which this incident took place is disputed.  (*See* Dkt. 64-1 ¶ 20.)

### B.   Chen's Placement on a Performance Improvement Plan

Mix, Lillis and Wattley testified that individuals who received a "bottom" score on the 9 Block scale were required to be put on a PIP.  (Dkt. 64-1 ¶ 22.)  It is undisputed that Lapointe was not aware of this requirement until Mix informed him about it.  (*See* Dkt. 64-1 ¶ 25.)

On October 16, 2019, Triumph placed Chen on a PIP.  (Dkt. 64-1 ¶ 26.)  The PIP identified three performance issues: (1) completing assignments efficiently and timely; (2) technical writing (reports, presentations, test plans); and (3) communication.  (*See* Dkt. 56-22 (Def.'s Mot. Summ. J. Ex. 19, PIP) at Triumph000189.)  It also identified three behavior issues: (1) confrontational situations, (2) taking actions contrary to supervisor direction, and (3) inconsistent work hours.  (*See id.*)  With respect to "confrontational situations," the PIP stated,

"**Examples include confronting other <u>employees</u> regarding <u>their</u> citizenship . . . .**" (*See  id.* **(emphases added).)   The PIP included seven short-term assignments ("Items 1 through 7") in which Chen was directed to improve on the identified issues within 90 days.  (*See* Dkt. 64-1 ¶ 26.)  At the end of the document, the PIP stated, "We expect your performance rating to be 'Fully Competent' or you will be subject to further disciplinary action up to and including termination."  (Dkt. 56-22 at Triumph000190.)**

**Chen met with his supervisors on more than one occasion to complain about the PIP's unfairness.  On October 25, 2019, Chen met with Wattley to complain that the PIP was unfair.  (*Id.* ¶ 32.)  On December 6, 2019, he met with Ziotas to complain about the same.  (*Id.* ¶ 36.)  Five days later on December 11, he met with Lillis and Mix because he had not signed the PIP, and he lodged the same complaints then. (*Id.* ¶ 37.)  Lillis took notes during this meeting.  (*See id.*)  After the December 11 meeting, Chen signed the PIP but also submitted a rebuttal.  (*Id.*; Dkt. 56-26 (Def.'s Mot. Summ. J. Ex. 23, Rebuttal).)   He did not say he believed the PIP was discriminatory or retaliatory in his comments or at any of these meeting.  (Dkt. 64-1 ¶¶ 32, 37.)**

**Chen requested and received numerous extensions to the PIP.  Chen first requested an extension on October 25, 2019, which Lapointe approved.  (*Id.* ¶ 33; Dkt. 56-14 (Def.'s Mot. Summ. J. Ex. 11, Lapointe Aff.) ¶ 12.)  Between January 8 and 14, Chen asked for additional extensions, which both Anderson and Lapointe approved.  (Dkt. 56-13 (Def.'s Mot. Summ. J. Ex. 10, Anderson Aff.) ¶ 11 (citing Ex.**

E of Aff.).)  The evidence indicates at least one of the PIP deadlines was extended to February 13, 2020.  (*See id.* at Ex. E of Aff.)

### C.    Chen's Age Discrimination and Retaliation Complaints

On December 13, 2019—two days after he met with Lillis and Mix about the PIP—Chen lodged his first discrimination complaint.  He e-mailed Mix, informing her that Don Martinsen, an engineering assembly and test technician, harassed him on four occasions within the previous two months, "including making comments like you are not 30 years old, have some white hair, we don't work with people who dye their hair."[2]  (Dkt. 56-27 (Def.'s Mot. Summ. J. Ex. 24, E-mail 12/13-16/19) at CHEN000213; Dkt. 64-1 ¶ 63.)  He identified Brede Doerner, Ed Russo, and Charles Navarro as witnesses.  (*See* Dkt. 56-27 at CHEN000213.)  Chen stated that he believed Martinsen's comments were "a form of age discrimination and harassment," but added, "I don't want to talk to him in private because that would be portraited as confrontation as it was done to me many times falsely."  (*Id.*)  Later that day, Mix informed Chen that she would "absolutely look into this and speak to Mr. Martinsen."  (*Id.* at CHEN000212.)

Three days later, Chen informed Mix that Martinsen apologized to him.  (*See id.* at CHEN000215.)  After expressing his gratitude to her for speaking with Martinsen, he added, "To be honest with you, I think giving me bottom performance rating in 2019 and give me 90 Performance Plan are age discrimination too."  (*Id.*)  Mix responded, "Thank you for the update regarding Don and I'm glad to hear this.

---

[2] It is undisputed Martinsen did not have supervisory authority over Chen.  (Dkt. 64-1 ¶ 63.)

Should you wish to speak to me about your situation please feel free to come by the HR area." (*Id.* at CHEN000214.)  There is no evidence that Chen spoke with her.

Mix testified that she did not investigate this complaint.  (*See* Dkt. 56-6 (Def.'s Mot. Summ. J. Ex. 3, Mix Depo.) at 97:8−98:3.)  When asked why not, she stated:

> No, because the PIP was based on performance only.  It had nothing to do with age.  They were trying to turn around someone's performance.  It had nothing to do with that.  So knowing what was in the PIP, knowing it was performance based, there was no credibility to that statement.

(*Id.*)  In addition, in response to the following question, Mix testified:

> Q: I'm asking generally, you know, as an HR professional with decades of experience, do you agree with the general proposition that a manager can be taking a discriminatory action as an employee even though they don't identify age in writing as the reason why they're taking the action?
>
> A: We had a guy not performing.  Had nothing to do with his age.  All of the other managers, myself, his managers, were either the same age or older.  Others that were put on PIPs were younger.

(*Id.* at 99:10−24.)   Mix did not inform Chen's supervisors about the age discrimination complaint.  (Dkt. 64-1 ¶ 42.)

On January 7, 2020, Chen e-mailed Lillis, Wattley, Anderson, Lapointe, Mix and Daubert that he felt he was being subjected to retaliation "due to the fact that I have complained about age discrimination here," attaching his previous complaints to Mix.  (Dkt. 56-28 (Def.'s Mot. Summ. J. Ex. 25, 1/7/20).)  Specifically, he alleged Lapointe and Anderson retaliated against him by not replying to his emails and delaying his progress.  (*Id.*)  This was the first time that his supervisors became aware of his age discrimination and retaliation complaints.  (Dkt. 64-1 ¶ 44.)

Chen complained to Mix and Daubert about the same types of delays a week later, on January 15.  (*See id.* ¶ 47.)  His detailed complaint includes examples of how Lapointe and/or Anderson insisted on meeting with him yet would not move projects forward, assigned projects outside the PIP, held him to unreasonably high standards, and criticized him for work outside his control.  (Dkt. 56-30 (Def.'s Mot. Summ. J. Ex. 27, E-mail 1/15/20) at Triumph000893.)  The following day, on January 16, Mix met with Chen and explained that Wattley, Anderson and Lapointe had not been aware of his December complaints.  (Dkt. 64-1 ¶ 48.)

At 4:12 PM on January 16, 2020, Chen forwarded his December 2019 complaint to Wattley, Anderson and Lapointe. (Dkt. 56-31 (Def.'s Mot. Summ. J. Ex. 28, E-mail 1/16/20).)  He stated, "MaryEllen just told me that you did not know about my initial complaint against Don Martinsen for Age Discrimination until I complained about retaliation the first time around on January 7, 2020." (*Id.*)  He explained he was forwarding the complaint "in the name of communication." (*Id.*)

At 7:06 PM, Wattley separately e-mailed Lillis, stating, "I have reached the point where I do not want to give Alex the benefit of the doubt anymore.  He had basically shattered my hope that he can turn this around." (Dkt. 64-26 (Pl.'s Opp'n Ex. 25, E-mail 1/16/20).)  Wattley added, "I would like to have a meeting with you, me, MaryEllen, Dean and Roger to see what we need to do to end this relationship." (*Id.*)  Wattley denies this e-mail is related to Chen's complaint forwarded earlier that day.  (*See* Dkt. 56-7 (Def.'s Mot. Summ. J. Ex. 4, Wattley Depo.) at 97:23−101:17.)

During the same time period—specifically between January 14 and 22, 2020—Chen e-mailed with Anderson, Wattley, Lapointe, Mix and Daubert with the

subject: "TA-7 ECP discussion."  (Dkt. 56-33 (Def.'s Mot. Summ. J. Ex. 30, E-mail 1/16/20).)   In summary, Chen disagreed with Anderson and Lapointe (and vice versa) about the need for additional meetings, the progress of the project, and obstacles impeding the project.  The e-mail chain culminated with Chen stating,

> To argue [testing protocol] otherwise as Dean Anderson did and accuse me for no substantiation have no merit, have bogged me down and impacted my ability to do my job negatively.  Dean is making me inefficient to do my job.  Later on, Dean and Roger will make a case to say I spend more time than usual to do my job without acknowledging how they bogged me down.  Dean failed to do his duty to investigate the cause of the back to back failures of the validation tests.  Dean and Roger Lapointe continued to come up with all kinds of excuses and road blocks <u>to retaliate me for my complaints against Dean and others' age discrimination.</u>

(*Id.* at Triumph000122 (emphasis added).)  This was the first time Chen mentioned discrimination and retaliation in this e-mail chain.   Anderson's three-word response to all except Chen: "I've had enough."  Anderson and Lapointe deny that this statement meant Anderson wanted to terminate Chen.  (*See* Dkts. 56-8 (Def.'s Mot. Summ. J. Ex. 5, Anderson Depo.) at 189:24−190:7; 56-9 at 166:4−9.)  Wattley, however, testified that he had discussions with Anderson and Lapointe and they agreed, by January 16, 2020, to terminate Chen's employment.  (*See* Dkt. 56-7 at 108:3−112:6, 116:21−117:13.)

Chen testified that, in approximately April 2019, Wattley told him, "Old engineers are more expensive."  (Dkt. 64-11 (Pl.'s Opp'n Ex. 10, Chen Depo.) at 48:9−13.)  He did not complain about this comment while he was employed.  (Dkt. 64-1 ¶ 70.)  According to Chen, Wattley said this comment directly to him while no one else was present.  (*Id.* at 49:21−23.)  Wattley did not recall saying this exact comment to Chen.  (Dkt. 56-7 at 79:14−81:7.)  He instead recalled that they "had

several conversations, especially around review time, of salary increases, getting paid more." (*Id.*) Wattley explained, "I mean, we pay more for education. We pay more for experience, which generally end up being older employees." (*Id.*)

> ### D.    Chen's Termination

On or about January 29, 2020, Anderson and Lapointe drafted their assessment of Chen's performance concerning the PIP's seven assignments, which they finalized on January 31. (Dkt. 56-36 (Def.'s Mot. Summ. J. Ex. 33, PIP Report 1/31/20).) They determined Chen met the objective for Items 1, 3, and 7; he partially met the objective for Items 2, 5 and 6; and he did not meet the objective for Item 3.[3]  With respect to Item 7—"Submit a weekly update on status of above tasks"—they commented, "Completed as requested but updates have recently deteriorated in that update is being used as a vehicle for complaint / blame." (*Id.* at Triumph001525.)

With respect to his three performance issues, Anderson and Lapointe concluded the following: "no improvement" for completing assignments and communication, and "insufficient improvement" for technical writing. (*Id.* at Triumph001524.) With respect to completing assignments, Anderson and Lapointe stated, "Although 90 days may not be sufficient to provide concise feedback, recent requests to extend some tasks significantly is an indicator of some persistent inefficiencies." (*Id.* at Triumph001523.) As for communication, they explained, "Communication still problematic and causing difficulties in moving

---

[3] On November 25, 2019, Lapointe confirmed with Chen that Items 1, 2 and 6 were completed. (*See* Dkt. 64-18 (Pl.'s Opp'n Ex. 17, E-mails 11/1/19 to 11/25/19).)

forward on assignments with many hours being spent debating even the most trivial matters." (*Id.*)

As for his behavioral issues, they gave Chen a rating of "no improvement" for confrontational issues and "insufficient improvement" for inconsistent work hours.  They did not give Chen a rating for "actions taken . . . completely contrary to supervisor direction" but provided the following comment: "No specific incident during 90-day period."   When asked why he did not give Chen a rating of "satisfactory improvement" for this last category, Lapointe admitted he should have acknowledged the improvement.  (*See* Dkt. 64-9 (Pl.'s Opp'n Ex. 8, Lapointe Depo.) at 205:6−18.)  He stated, "All I can say it was an oversight because you're right, he did not have any.  So you can take that as an improvement, and we could have given him credit for it." (*Id.*)

It is undisputed that Wattley, Anderson and Lapointe decided to terminate Chen's employment.  (Dkt. 64-1 ¶ 59.)  It is also undisputed that Daubert and Lillis had veto authority, which they did not utilize.  (*Id.*)  The parties dispute the date when Wattley, Anderson and Lapointe decided to terminate him.  (*Id.*)

Triumph terminated Chen on February 4, 2020.  (*Id.* ¶ 60.)  Triumph gave Chen a letter explaining, "In making this decision, the company considered your previous allegations of age discrimination and retaliation."  (Dkt. 64-34 (Pl.'s Opp'n Ex. 33, Termination Ltr.) at CHEN001185.)  The letter outlined Chen's complaints and concluded:  "Neither your age, nor your complaints, played any role in any employment decision, including your 2019 evaluation, placement on the PIP, or your termination today."  (*Id.* at CHEN001186.)  It added, "Your blatant efforts to

14

shift the blame for your performance and behavioral issues to others were unethical and unpersuasive." (*Id.*)

After his termination, Chen's second assignment in the PIP—"Revise EMC-51 stepper air gap presentation and generate a comprehensive SOW for SLMTI and present to management," (Dkt. 56-36 at Triumph001525)—was redistributed to "Jeremy," another engineer, (*see* Dkt. 64-10 (Pl.'s Opp'n Ex. 9, Anderson Depo.) at 217:2−7). Chen contends that "Jeremy" was younger and that Triumph hired three other younger engineers, (Dkt. 64-1 ¶ 61) but there is nothing in the record establishing the ages of these individuals.

### E.   Alleged Comparators

In 2018 and 2019, Triumph hired 12 people in Wattley's engineering group, which included people in Product Support. (Dkt. 64-1 ¶ 62.) Out of these 12 individuals, five were over 40 years old and all of them were younger than Chen.

Chen identified three comparators: younger engineers who were given significant time to improve on their PIP assignments (but were ultimately terminated).

John Ellis, born November 1989, worked as a Project Engineer from 2017 through 2018. (*Id.* ¶ 64.) He directly reported to Nancy Miller, who reported to Wattley. (*Id.*) Triumph placed him on a PIP on September 19, 2017, and terminated him March 1, 2018. (*Id.*) He spent five months and ten days on a PIP.

Gustavo Torralba, born June 1995, worked as a Product Support Engineer from 2019 through 2022. (*Id.* ¶ 65.) He reported to Lapointe. (*Id.*) Triumph placed him on a PIP on May 28, 2021, and terminated him on April 15, 2022 as part of a

reduction in force because he did not complete his PIP.  (*Id.*)  He spent ten months and 18 days on a PIP.

Kenneth Weber, born February 1966, began working for Triumph in 2006 and worked as a Field Service Engineer in 2018.  (*Id.* ¶ 66.)  He reported to Anderson and Lapointe.  (*Id.*)  Triumph placed him on a PIP on January 12, 2018, and terminated him on April 7, 2018, as part of a reduction in force.  (*Id.*)  He spent 2 months and 26 days on the PIP.

### F.   After-Acquired Evidence

Triumph asserts an "after-acquired evidence" defense.  (Dkt. 51-2 (Def.'s 56(a)(2) Stmt.) ¶ 3 (citing Dkt. 33 at 11).)  Mix, who served as Triumph's 30(b)(6) witness, testified that Triumph discovered personal items on his computer and in his office in February and March 2020, after his termination.  (Dkt. 51 (Pl.'s Mot. Summ. J. & Exs.), Ex 2 (Mix Depo.) at 17:8−18:15.)  Mix described the items as follows: (1) "a number of XL files regarding construction work;"[4] (2) a Nintendo Game Cube, a Wii, Nintendo Game Boy; "hundreds of personal documents" including "outrageous to-do list[s]" so voluminous that she added, "I don't know who in their right mind would be able to do all of that work." (*Id.*)  Mix testified that this conduct violated the IT acceptable use policy.  (*Id.* at 25:21−26:5.)

Mix testified that, upon discovering these documents and gaming system, "It appeared to us that he was spending a lot of time on personal issues, which is

---

[4] Mix testified that the construction documents "almost appeared to us that the employee was operating a second company, or a company on the side."  (*Id.*)  She added, "It didn't look like it was construction work for his own property."  (*Id.*)  When asked whether Triumph determined Chen operated a company on the side, Mix testified, "It was speculation.  I don't have any information as to whether Alex was doing that or not."  (*Id.* at 19:7−12.)

why he wasn't completing assignments." (*Id.* at 20:1−3.)  Plaintiff's counsel then

posed a hypothetical premised on an employee without purported performance

issues, eliciting the following response:

> Q: [I]f there were no concerns about Mr. Chen's performance, would Triumph have terminated Mr. Chen's employment in February or March of 2020 once it discovered this information that you described solely based on those conduct issues?

> A: Possibly.  We would sit and discuss it, but we hadn't because that wasn't what was happening.

(*Id.* at 20:11−20.)  When asked whether discovery of the electronics would have

resulted in termination, Mix responded, "It depends. . . . I couldn't answer that right

now, because we look at the total picture."  (*Id.* at 23:10−21.)  Mix did not know

whether Triumph had ever terminated an employee for similar conduct or for

conduct that violates the IT acceptable use policy.  (*Id.* at 25:5−17, 27:11−22.)  She

also did not know whether Triumph chose not to terminate an employee on these

bases.  (*See id.*)

## II.    LEGAL STANDARD

Summary judgment should be granted if "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine

factual disputes exist.  *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.

2010).  "In determining whether that burden has been met, the court is required to

resolve all ambiguities and credit all factual inferences that could be drawn in favor

of the party against whom summary judgment is sought."  *Id.* (citing *Anderson,* 477

U.S. 242 at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587

(1986)).  If there is any evidence in the record that could reasonably support a jury's

verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citations omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *See Hayes v. New York City Dep't of Corr.*, 84 F. 3d 614, 619 (2d Cir. 1996).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed. R. Civ. P. 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).  A plaintiff may not rely solely on "the allegations of the pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion for summary judgment are not credible.  *Id.* (internal citations omitted).  "At the summary judgment stage of the proceeding, [the non-movant is] required to present admissible evidence in support of [his] allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch– Rubin v. Sandals Corp.,* No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing *Gottlieb*, 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists

of conclusory assertions without further support in the record, summary judgment may lie.  *See Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

On cross-motions for summary judgment the same standard applies. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  That is, "the district court evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022) (internal quotation marks omitted).

## III.    DISCUSSION

Chen brings claims for age discrimination and retaliation under the ADEA and CFEPA.  Courts analyze employment discrimination and retaliation claims brought under the ADEA and the CFEPA with the familiar *McDonnell Douglas* burden-shifting framework.  *See Lively v. WAFRA Investment Advisory Grp., Inc.*, 6 F.4th 293, 302 n.3, 303 n.6 (2d Cir. 2021) (ADEA); *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (CFEPA).

The *McDonnell Douglas* framework has three steps.  First, it requires the plaintiff to establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802, of which the elements vary for each type of claim.  The Second Circuit has noted that the burden to establish a prima facie case is "minimal" or "*de minimis*."  *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Second, if the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse

employment action.  *See McDonnell Douglas*, 411 U.S. at 802.  At this stage, the defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted).

Third, if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination.  *See McDonnell Douglas*, 411 U.S. at 804.  "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143.

The ADEA's and the CFEPA's causation standards are different.  Under the ADEA, a plaintiff must establish that his age was the "but for" cause of the defendant's decision to take an adverse action.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *see generally Lively*, 6 F.4th at 303−04 ("Like the ADEA's antidiscrimination provision, the ADEA's antiretaliation provision uses the word 'because,' indicating that a but-for causal relationship is required to state a claim.").  The Connecticut appellate court recently rejected the ADEA's "but for" causation standard for age discrimination claims brought under the CFEPA, holding the less stringent "motivating factor test" applies.  *See Wallace v. Caring Solutions, LLC*, 213 Conn. App. 605, 623 (2022).  While the *Wallace* court did not

explicitly adopt the motivating factor test for age retaliation claims as well, it strongly suggested it would with its broad holding, "[W]e conclude that, regardless of the United States Supreme Court's decision in *Gross* and the Second Circuit's decision in *Natofsky*, the motivating factor test remains the applicable causation standard under CFEPA." *Id.* In view of the open question, the Court considers both standards for both types of claims.

### A. <u>Retaliation</u>

Chen claims that Triumph terminated his employment in retaliation for complaining that a) his 2019 performance evaluation, placement on a PIP, and a coworker's age-based comments were discriminatory; and b) his supervisors retaliated against him by not replying to his e-mails and intentionally delaying his progress on the PIP. Triumph argues that Chen cannot establish a *prima facie* case, that it legitimately terminated Chen for poor performance, and that Chen cannot establish the legitimate reason was pretextual.

### 1. Prima Facie *Case*

To establish a prima facie case for retaliation, a plaintiff must establish: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Lively*, 6 F.4th at 303 n.6. In moving for summary judgment, Triumph challenge all factors except the first. After Chen opposed the motion, Triumph filed a Reply in which it argued for the first time that Chen did not engage in protected activity.

As an initial matter, "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).   As this District's applicable Local Rule makes clear, "A reply memorandum must be strictly confined to a discussion of matters raised by, and must contain references to the pages of, the memorandum to which it replies."  D. Conn. L. Civ. R. 7(d).  Thus, Triumph's challenge to the first element of the *prima facie* case is waived.  *See Rodowicz v. Stein*, No. 3:20-cv-00710 (JAM), 2023 WL 1967246, at *6 (D. Conn. Feb. 13, 2023).

The Court starts with the third element: the adverse action.  Chen's Amended Complaint clearly identifies the adverse action as his termination.  (*See* Dkt. 25 ¶ 56.)  Yet in the motion for summary judgment, Triumph mischaracterizes the adverse action as "trivialities of the workplace" in reference to Chen's complaint that his supervisors did not reply to his e-mails timely and slowed him down.  (*See* Dkt. 56-1 (Mem. Summ. J.) at 38.)  The evidence establishes that Chen sent the following e-mail entitled "Retaliation" to Lillis, Wattley, Anderson, Lapointe, and Human Resources:

> I feel I am being retaliated due to the fact that I have complained about age discrimination here (please see the first attachment on age discrimination complaint against Don Martinsen and against giving me bottom performance rating in 2019 and against giving me 90 Performance Plan on 10/16/19). The retaliation actions I received including but not limited to repeatedly not reply to my emails timely, intentionally delay my progress in executing the 90 day plan given to me by Roger Lapointe and Dean Anderson on 10/16/19 (please see the 2rd [sic] attachment as an example).

(Dkt. 56-28 at Triumph000721.)   While this e-mail constitutes his protected activity—i.e., his "good faith, reasonable belief that he was opposing an employment practice made unlawful by [the ADEA]," *Kessler v. Westchester Cnty Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006)—it is not the adverse action

22

on which this claim is based.  Termination is a textbook adverse action that, if unlawful, is expressly prohibited under both the ADEA and the CFEPA.  *See* 29 U.S.C. § 623(d); Conn. Gen. Stat. § 46a-60(b)(4).

Because Triumph misapprehends Chen's retaliation claim, its challenge to the second element is similarly misplaced.  Triumph concedes that, in December 2019, Chen complained about age discrimination and retaliation to Mix who never told Chen's supervisors.  (*See* Dkt. 56-1 at 38.)  "[G]eneral corporate knowledge of the protected activity" is sufficient to establish the knowledge element.  *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 n.3 (2d Cir. 2013) (explaining defendant misapplied the "general corporate knowledge" principle to the causation element when the plaintiff correctly used the principle to establish the knowledge element).  Triumph also concedes that the decision-makers—Wattley, Anderson and Lapointe— learned of his protected activity on January 7, 2020.  (*See id.* at 28, 38.)  The admissions and evidence establish the second element.

As to the fourth element, temporal proximity alone can establish a causal connection for purposes of the *prima facie* case.  *See Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) ("Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity.").  Triumph terminated Chen within a month of his complaint to his supervisors and within two months of his complaint to Human Resources.  Both events are close enough in time to his termination such that Chen has establish this element of his *prima facie* case.  *See Gorzynski v. JetBlue Airways Corp.*, 596

F.3d 93, 110−11 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

Triumph contends that this case is similar to *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87 (2d Cir. 2001).[5]  It is wrong.  The *Slattery* employer began expressing dissatisfaction with the plaintiff's performance in February 1997, reassigned him, put him on probation, and extended his probation twice before it ultimately terminated him three years later.  In explaining that "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity," the Second Circuit explained the company reduced the plaintiff's job responsibilities five months before his EEOC complaint.  *Id.* at 95.  Here, Triumph placed Chen on a PIP in October 2019, Chen complained in December, and he was fired by the beginning of February 2020.  This timeline is substantially truncated in comparison to *Slattery*.

Aside from temporal proximity, Chen argues there is direct evidence that Triumph considered his protected activity in terminating him.  First, Triumph attached his complaints to its final PIP review.  (*See* Dkt. 64 (Pl.'s Opp'n) at 30.)  Second, Triumph directly referenced Chen's complaints in the termination letter.  Specifically, the termination letter states that the company "considered [Chen's]

---

[5] The Court noticed counsel's discussion about *Slattery* is a direct quote from an opinion authored by Magistrate Judge Robert A. Richardson without attribution.  *Compare* Dkt. 56-1 at 39−40 *with MacDuff v. Simon Management Associates II*, No. 3:20CV773 (RAR), 2022 WL 972426, at *12 (D. Conn. Mar. 31, 2022).  The Court treats this as a mistake and cautions counsel to be mindful of carefully and properly attributing quoted material to avoid running afoul of the Rules of Professional Conduct, including Rule 8.4.

previous allegations of age discrimination and retaliation." (Dkt. 64-34 at CHEN001185.) Although Triumph concluded that Chen's complaints were "blatant efforts to shift the blame for your performance and behavioral issues to others were unethical and unpersuasive," (*id.* at CHEN001186), Chen vociferously disagrees, (*see* Dkt. 64 at 30−31). As these documents are direct evidence of Triumph's motive, and it is for the jury to decide whether to believe Chen or Triumph. *See Cifra v. G.E. Co.*, 252 F.3d 205, 213 (2d Cir. 2001); *see also Duplan*, 888 F.3d at 625.

### 2. *Legitimate Business Reason*

Triumph states that it had a legitimate, non-discriminatory reason to terminate Chen: his "performance and behaviors [sic] deficiencies," (*see* Dkt. 56-1 at 32), which are well-documented in his PIP, (*see* Dkt. 56-22). Poor performance and behavior issues are legitimate, non-discriminatory reasons for termination. *See Gorzynski*, 596 F.3d at 107 (finding evidence supported the defendant's reasons for termination: "her 'management style,' 'unprofessional conduct and poor interpersonal skills,' and the 'hostile work environment' she created). Accordingly, Triumph has satisfied its burden.

### 3. *Pretext*

Chen offers ten reasons why Triumph's legitimate, business reasons for terminating him are pretextual. First, his evidence at the *prima facie* stage is sufficient to establish pretext. (*See* Dkt. 64 at 32.) Second, evidence establishes Chen's complaint impacted Triumph's decision to terminate him. (*Id.* at 32−33.) Third, the decision-makers resolved to terminate Chen before they completed the PIP review. (*Id.* at 33.) Fourth, the decision-makers presented conflicting

testimony about when and how they agreed to terminate Chen. (*Id.* at 32, 34.) Fifth, Triumph deviated from its standard practice of providing Chen feedback. (*Id.* at 35−36.) Chen's supervisor initially told Chen he completed PIP Items 1, 2 and 6 but then—after Chen complained—he informed Chen he had only "partially met" Items 2 and 6 and delivered this news for the first time mere days before the PIP's expiration. (*Id.*) Sixth, Triumph's evidence contains weaknesses, inconsistencies, and contradictions. (*Id.* at 36.) Seventh, Triumph treated Chen differently from other engineers who were placed on a PIP. (*Id.* at 36−37.) Eighth, Triumph exaggerated and mischaracterized Chen's purported "lack of improvement" on the PIP items. (*Id.* at 37.) Ninth, Triumph failed to investigate Chen's discrimination and retaliation complaints in violation of its policies. (*Id.* at 38.) Tenth, a jury could conclude Triumph's assertion Chen was a poor performance is pretextual, because Chen had "extensive experience and training as an engineer" as well as "nine years of positive performance evaluations." (*Id*. at 38−39.)

Triumph relies on its pretext argument concerning the discrimination claim. Namely, Triumph contends that Chen merely "second-guess[es]" Triumph's reasons for termination, but doing so does not satisfy the pretext standard. (Dkt. 64-1 at 35.) Triumph also argues that Chen cannot establish a *prima facie* case of age discrimination and therefore fails at the pretext stage. (*Id.*) Lastly, Triumph initiated "performance management that occurred prior to any claim of discrimination." (*Id.* at 35−36; Dkt. 67 (Reply) at 9.) Triumph's Reply does not address Chen's pretext arguments.

26

After reviewing the parties' briefing and evidence, the Court concludes this is a textbook case for the jury to decide.  *See Rubin v. ADT, LLC*, No. 3:17-CV-01529 (KAD), 2019 WL 4366545, at *7 (D. Conn. Sept. 12, 2019) ("All of this evidence, in sum, is grist for the jury's mill.  It is not for this Court, on summary judgment, to decide the impact or import of the evidence.  Rather, the Court merely determines whether there is sufficiently competing evidence on issues of material fact so as to require a trial.") (citing *Anderson*, 477 U.S. at 249).  Indeed, there are so many genuine issues of material fact that it would be an ideal law school exam.  The Court summarizes the key issues below.

i.    Chen's Complaints Motivated Decision-makers

Chen complained about discrimination to Human Resources and his supervisors no less than five times, and their responses to his complaints are both direct and indirect evidence of retaliation.  Chen's first two complaints were lodged in December 2019 and were submitted only to Human Resources.  On December 13, 2019, Chen informed Mix that a co-worker made age-based comments.  (*See* Dkt. 56-27.)  Mix addressed the situation, and the coworker apologized.  (*See* Dkt. 56-28.)  Three days later, Chen also complained to Mix that he believed his 2019 performance review and PIP constituted age discrimination.  (*Id.*)  She informed him that he should "feel free to come by the HR area" to speak with her, but he did not and she did not investigate his complaint.  (*Id.*)

On January 7, 2020, Chen e-mailed his direct and indirect supervisors and Human Resources, informing them of his previous age discrimination complaint and explaining that he viewed his supervisors' repeated failure to timely respond

to e-mails and delaying his PIP progress as retaliation.  (*Id.* at CTRL00000454-1.)
Mix forwarded the e-mail to Anderson and Lapointe, informing them she believed
the 90-day PIP period was coming to a close that week and that they should set up
a meeting. (Dkt. 64-23 (Pl.'s Opp'n Ex. 22, Forwarded E-mail 1/7/20) at
Triumph000773–74.)  Mix explained: "Should you feel things are improving and
being resolved – terrific.  Should things continue to be an issue we may need to
discuss next steps after your meeting with Alex."  (*Id.* at Triumph000773–74.)
Lapointe responded that he was "targeting the end of the month" for the PIP's
termination and confirmed that he would set up a meeting for the "initial technical
review."  (*Id.* at Triumph00073.)  These emails show a direct connection between
Chen's complaint about discrimination and Triumph's consideration of
termination.

Chen reiterated his complaints to Human Resources the following week on
January 15, 2020. (*See* Dkt. 56-30.)  While there is no evidence that this e-mail was
circulated to his supervisors, the very next day, Wattley e-mailed Lillis stating,

> I have reached the point where I do not want to give Alex the benefit
> of the doubt anymore.  He had basically shattered my hope that he can
> turn this around.  I would like to have a meeting with you, me
> MaryEllen, Dean and Roger to see what we need to do to end this
> relationship.

(Dkt. 64-26.) Lillis agreed, said he already met with Mix that day, and explained Mix
wanted to complete the 90-day PIP "just so we go thru all the process correctly and
completely."  (*See id.*)  While Lillis stated he "heard [Chen] was raising his voice in
meetings in a very unprofessional manner" based on the timing of Wattley's e-mail
and Lillis' conversation with Mix, a reasonable jury could conclude these

supervisors were aware Chen complained about discrimination again and decided to terminate him.

Chen complained again on January 22, 2020, this time to Anderson, Lapointe, Wattley, and Human Resources.  (Dkt. 56-33.)  Chen lodged this complaint at the end of a week-long e-mail chain in which Lapointe, Anderson and Chen engage in a heated discussion about Chen's progress on pending projects. (*See id.*)  Specifically, Chen explained that Anderson and Lapointe had been impacting his ability to do his job by slowing down his projects, and concluded with the following: "Dean and Roger Lapointe continued to come up with all kinds of excuses and road blocks to retaliate [against] me for my complaints against Dean and others' age discrimination."  (*Id.*)  Anderson responded to all e-mail recipients except Chen with three words: "I've had enough."  (*Id.*)  The fact that Anderson did not make a comment remotely similar to this until after Chen engaged in protected activity could lead a jury to conclude that Anderson resolved to terminate Chen in direct response to his protected activity.  *See Cifra*, 252 F.3d at 217.

To summarize, this evidence presents myriad questions of fact for the jury. On the one hand, it is possible a jury could conclude that Chen's supervisors believed Chen to be overly combative, a poor communicator, and incapable of improving his performance.  On the other hand, his supervisors repeatedly discussed Chen's termination in response—directly or indirectly—to his protected activity, and a jury could conclude Chen's complaints motivated Triumph to terminate him.  Still, the jury's conclusion may not even be so black and white.  The

Supreme Court has explained in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020), that "events have multiple but-for causes," offering the following example: "[I]f a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." *Id.* In other words, it is possible that Chen had performance issues **and** his protected activity was a "but for" cause of his termination. Whether Chen's termination was motivated by retaliatory animus will be a question for the jury to decide.

ii.   Triumph Failed to Follow its Policies

Having found that the above documents warrant a denial for summary judgment, the Court need not go further but will do so in any event. The Court finds that Triumph's failure to follow its own policies is further evidence of pretext. Triumph failed to follow its own policies in two key respects.

First, a reasonable jury could find Chen's supervisors failed to give him a meaningful opportunity to improve on the PIP items. Both Lapointe and Wattley testified the purpose of the PIP is to give an employee the opportunity to improve. Lapointe stated, "The purpose is to identify areas that are problematic or need development and provide a means of demonstrating and gaining improvements." (Dkt. 56-9 at 39:25–40:2.) Similarly, Wattley testified, "The PIP is trying to encourage, change behaviors, do things better. We work with the people to try to make that happen." (Dkt. 56-7 at 75:21–25.) After reviewing the evidence, the Court finds a reasonable jury could conclude that Chen's supervisors criticized his PIP progress without providing a meaningful opportunity to improve. On November 1,

30

2019, only two weeks after Triumph put Chen on a PIP, Lapointe confirmed Chen had completed PIP Items 1 and 6.  (*See* Dkt. 64-18.)  Lapointe made this representation even though, three days prior, a colleague made substantial comments about Chen's work product on the Item 6 project.  (*See* Dkt. 56-9 at 222:9−24.)  In explaining why he did not share these comments, Lapointe testified, "Conversationally and as I stated before it wasn't necessarily the goal to get the opportunity for corrections.  It was just to assess what work that had been done." (*Id.*)  Later in November, Lapointe also confirmed Chen completed Item 2.  (Dkt. 64-18 at CHEN001205.)  Yet at the end of the PIP, Lapointe wrote in the status report that Chen had only "partially met" the objective for Items 2 and 6.  (Dkt. 56-36 at Triumph001525.)  Lapointe admitted his November 1 e-mail and his final evaluation were inconsistent.  (*See* Dkt. 56-9 at 221:9−222:24.)

Second, a reasonable jury could find Triumph failed to investigate Chen's complaints about age discrimination and retaliation.  Triumph's Human Resources Guidelines states: "All complaints of unlawful discrimination or harassment will be investigated promptly and in as impartial and confidential a manner as possible." (Dkt. 56-17 at Triumph 000219.)  Human Resources did not initiate an investigation when Chen complained about the negative performance review and the PIP being discriminatory.   Mix testified that she did not investigate Chen's complaint "because the PIP was based on performance only," adding, "It had nothing to do with age."  (Dkt. 56-6 (Mix Depo.) at 97:23−98:3.)  Mix completely disregarded the possibility that the PIP could have been motivated by Chen's supervisors' desire

to squeeze him out because of his age.  But without conducting an investigation, she concluded "there was no credibility to [Chen's] statement."  (*Id.*)

An employer's failure to follow its own policy is evidence of discriminatory intent.  Evidence that the employer "did not follow its own procedures for addressing employee performance deficiencies" is evidence of discriminatory treatment.  *Cosgrove v. Sears Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993) (stating this rule at the prima facie stage); *see generally Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) ("[W]here a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent.").  Moreover, as the Second Circuit has pointed out, "an employer's failure to conduct an investigation when faced even with an internal complaint … might be viewed as evidence of an indifference to [ ] discrimination, if not acquiescence in it."  *Cox v. Onondaga County Sheriff's Department*, 760 F.3d 139, 149 (2d Cir. 2014) (Title VII retaliation based on race discrimination complaint).  Accordingly, a jury reviewing Triumph's failure to follow its own procedures and policies could conclude the company acted with retaliatory intent.

### iii.    Inconsistencies Between Deponents

Moving on to oral evidence, the Court finds that Triumph's witnesses inconsistently testified about material facts—namely, the dates they decided to terminate him and who made the decision—and such inconsistencies could lead a jury to conclude Triumph retaliated against him.  *See Zann Kwan*, 737 F.3d at 846

(stating "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's evidence can establish pretext).

With respect to the termination decision date, Wattley could not recall when they decided to terminate Chen but stated "we had been talking about it" as of January 8, 2020, and had made the decision by January 16. (Dkt. 56-7 at 108:3−112:6, 114:8-20, 116:21−117:13.)   In contrast, Anderson testified the termination decision was made between January 22 and February 4, (*see* Dkt. 56-8 at 191:8−24) and Lapointe testified that the decision to terminate Chen was not made until around February 4, 2020, (*see* Dkt. 56-9 at 65:14−24).

The supervisors similarly testified inconsistently with respect to who made the decision.  Wattley testified that he had discussions with Anderson and Lapointe and, by January 16, 2020, they reached a "consensus" that they did not want to continue Chen's employment.  (*See id.* at 108:3−112:6, 116:21−117:13.)  Lapointe could not recall whether, by January 29, 2020, he communicated his personal view that Chen should be terminated.  (*Id.* at 187:18−188:6-11.)  He added, and "I don't know whether or not I had that kind of discussion with Wayne." (*Id.*)  Lapointe also testified that the decision-makers were Wattley, Anderson and him, (*see id.* at 63:11−22), but he later stated, "I don't know who makes that final decision.  It wasn't me," (*id.* at 189:12−14).  By virtue of the inconsistent testimony regarding material facts, a jury could conclude this is evidence of pretext.

### iv.    Lapointe's Other Inconsistencies

Lastly, the PIP contains several errors which a reasonable jury could find are evidence of discriminatory intent.   Indeed, evidence of inaccuracies in an

33

evaluation can lead a jury to reasonably conclude that the evaluator deliberately scored the employee in a manner that would result in the adverse action.  *See Rubin*, 2019 WL 4366545, at *7.  An exemplar of these inaccuracies are as follows:

First, Lapointe testified that he ranked Chen as a Solid Performer in Communicating Effectively, EMC-51 Stepper Motor Testing, and Acting with Integrity in his 2018 annual review, but these ratings were inaccurate.  (*Id.* at 47:24−48:7.)  Rather, Lapointe claimed during his deposition that Chen deserved a "Development" rating.  (*Id.* at 49:24−50:2.)  A reasonable jury could conclude that Lapointe is misrepresenting Chen's past satisfactory performance to justify the stark change in his 2019 annual review and placement on the PIP.

Second, with respect to Chen's behavioral issue of creating "confrontational situations," Lapointe wrote, "Examples include confronting other <u>employees</u> regarding <u>their</u> citizenship." (Dkt. 56-22 at Triumph000189.)  Yet the undisputed evidence establishes only one individual complained about Chen's citizenship comment (*see* Dkt. 56-15 ¶¶ 3−5).

Third, Triumph argues that it gave Chen every PIP assignment extension he requested.  (Dkt. 64-1 ¶ 33; Dkt. 56-14 ¶ 12; Dkt. 56-13 ¶ 11 (citing Ex. E of Aff.).)  These extensions moved his PIP deadline from January to mid-February.  (*See* Dkt. 56-13 at Ex. E of Aff.)  Triumph claims that Lapointe and Anderson "decided not to hold Plaintiff accountable for meeting the deadlines of the short-term assignments."  (Dkt. 64-1 ¶ 35.)  Yet, the January 31 PIP status report stated that, with respect to Completing Assignments, "recent requests to extend some tasks significantly is an indicator of some persistent inefficiencies."  (Dkt. 56-36 at

Triumph001523.)  Moreover, given the extensions, Triumph terminated Chen before his PIP deadline.  (*See* Dkt. 56-13 at Ex. E of Aff.)  A reasonable jury could conclude that Triumph's decision to allow extensions but then criticize his "persistent inefficiencies" placed him in an impossible Catch-22.

> **B.**   <u>Discrimination</u>

Triumph argues that Chen cannot establish a *prima facie* case of discrimination, because he cannot establish discriminatory intent.  In support, Triumph makes five arguments: (1) the decision-makers were the same age or older as Chen; (2) Chen's performance and behavior issues predated his 2019 annual review and PIP; (3) Triumph put younger employees on PIPs; (4) Triumph hired employees in Chen's protected class; and (5) decision-makers did not make ageist comments.  (*See* Dkt. 56-1 at 27−28.)  Chen contends that the retaliation evidence also establishes a discriminatory intent and adds that Triumph reassigned his work to younger employees.  (Dkt. 64 at 41.)  Triumph relies on its *prima facie* evidence to challenge pretext.

The Court finds there is sufficient evidence to establish discriminatory intent.  First, in 2018 and 2019, Triumph hired more engineers outside of Chen's protected class.  Out of the 12 engineers Triumph hired, five were age 40 or older at the time of hiring, but three of those five were hired after Chen's termination.  (*See* Dkt. 56-11 (Def.'s Mot. Summ. J. Ex. 8, Mix Aff.) ¶ 19.)  All twelve individuals were younger than Chen.  (*Id.*)  Second, to explain the significant differences in Chen's 2018 and 2019 performance reviews, Lapointe testified that he gave Chen satisfactory performance ratings in 2018 even though he believed his performance

was deficient.   (*See* Dkt. 56-9 at 45:19−50:2.)   This inconsistency, and other inconsistencies identified above, may evince, to a trier of fact, discriminatory intent.   *See Zann Kwan*, 737 F.3d at 846.   Third, Chen's direct and indirect supervisors made statements like "I've had enough" and "I do not want to give Alex the benefit of the doubt anymore" either in direct response or the same day as Chen's age discrimination and retaliation complaints.   (Dkts. 56-33, 64-26.)   In addition to serving as direct evidence of retaliation, it is also evidence of Triumph's discriminatory motive.   *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173−74 (2005) ("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment.")   Indeed, much of Chen's retaliation evidence could be used as evidence of discrimination.   *See id.*

    For substantially the same reasons explained above, the Court also finds that this voluminous amount of evidence is sufficient to establish both Chen's *prima facie* case and pretext.   *See DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 177 (D. Conn. 2015) (stating plaintiff "may rely on the same evidence as established in his *prima facie* case to demonstrate pretext.")   Triumph has provided plenty of arguments explaining why none of this evidence is sufficient to establish discrimination.   But whether Triumph or Chen should be believed is a question for the jury to decide.   *See Cifra*, 252 F.3d at 213 ("The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact, and 'where there are two permissible views of the evidence . . . .").

### C.  <u>After-Acquired Evidence</u>

Chen moves for summary judgment of Triumph's "after acquired evidence" defense.  The company's 30(b)(6) witness, Mix, testified that in March and April 2020, Triumph discovered the following items on Chen's computer and in his office: (1) "a number of XL files regarding construction work;" (2) a Nintendo Game Cube, a Wii, and a Nintendo Game Boy; and (3) "hundreds of personal documents" including "outrageous to-do list[s]."  (Dkt. 51, Ex. 2 at 17:8−18:15.)  Mix testified that these items violated IT's acceptable use policy.  (*Id.* at 25:21−26:5.)

The Supreme Court established in *McKennon v. Nashville Banner Publishing Company*, 513 U.S. 352 (1995) that an employer may use the doctrine of "after-acquired evidence" to limit damages, but it is not a defense to liability.  The Supreme Court defined the doctrine as follows: "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was <u>of such severity</u> that the employee in fact would have been terminated <u>on those grounds alone</u> if the employer had known of it at the time of the discharge."  *Id.* at 362−63 (emphases added).  It is the employer's burden to prove the employee would have been terminated "solely on the basis of the newly-discovered evidence."  *See Adduci v. Yankee Gas Servs. Co.*, 207 F. Supp. 3d 170, 183 (D. Conn. 2016) (quoting *Sanders v. Madison Square Garden, L.P.*, No. 06 Civ. 589 (GEL), 2007 WL 2254698 (S.D.N.Y. Aug. 6, 2007) (withdrawn in part on reconsideration on other grounds)).  The "after-acquired evidence" defense is typically inappropriate at the summary judgment phase unless there are no material issues of fact in dispute.  *See id.*

Here, there is no dispute of material fact for the jury, because the equivocal testimony of the 30(b)(6) deponent—who was called to testify solely about the after-acquired evidence defense—fails to meet Triumph's burden of proof.  Mix was asked whether Triumph would have terminated Chen's employment when it found the documents and electronics in his computer and office "if there were no concerns about [his] performance."  (*Id.* at 20:11−20.)  Mix's response: "Possibly. We would sit and discuss it."  (*Id.*)  She testified that she did not know whether a violation of the IT acceptable use policy would result in termination.  (*Id.* at 25:5−17, 27:11−22.)  When asked whether "Chen definitely would have been terminated" for the "issues relating to the computer and the Game Boy and the Wii" absent other performance concerns, Mix responded, "I couldn't answer that right now, because we look at the total picture."  (*Id.* at 23:10−21.)  To "look at the total picture" is decidedly not termination "on those grounds alone."  As the company representative, Mix's equivocation fails to establish by a preponderance of the evidence that Chen's policy violations were "of such severity" that Triumph would have terminated him "on those grounds alone."  *See McKennon*, 513 U.S. at 362−63; *see also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047−48 (7th Cir. 1999) ("If [the employer] cannot show by a preponderance of the evidence that the after-acquired evidence <u>would have</u> led to [the plaintiff's] termination, it has not made out the defense.") (emphasis added); *McNicholas v. Loyola Marymount Univ.*, No. CV 17-00386,  *EEOC v. Columbine Health Sys., Inc.*, No. 15-cv-01597, 2018 WL 6307883, at *1 (C. D. Cal. Sept. 19, 2018) ("[The employer] failed to establish that 'had it been aware of that evidence, it *would have forthwith* discharged' McNicholas

because [the employer], again, provided evidence that it 'most likely would have' terminated McNicholas, rather th[a]n evidence that it absolutely would have 'forthwith' terminated McNicholas.") (emphasis in original).

Indeed, this testimony is akin to a plaintiff injured in a T-bone car accident who alleges the defendant ran the red light but then, when deposed about whether the defendant ran the redlight, the plaintiff testifies, "It's possible."  Absent other evidence, a plaintiff could not recover damages based on a possibility.  Here, the only other evidence offered is affidavits from Mix and Wattley which were both signed after the 30(b)(6) deposition and after Chen filed his summary judgment motion.  Mix states that she "would have recommended that Triumph terminate Mr. Chen."  (Dkt. 58-4 (Mix Aff.) ¶ 8.)  This statement is still equivocal insofar as Mix still cannot affirmatively state that Chen would have been terminated for the conduct acquired after his termination.  Wattley, who was not designated as a 30(b)(6) witness but was one of three decision-makers who decided to terminate Chen, stated, "Based entirely on the discovery of the gaming equipment and Personal Work, Triumph would have terminated Mr. Chen.  (Dkt. 58-5 (Wattley Aff.) ¶ 7.)  It is unclear whether Wattley is speaking for himself as a Triumph supervisor or as an  undesignated 30(b)(6) witness.  If the former, Wattley's statement is not persuasive, because the termination decision would have been made with other supervisors and would have been subject to veto by his supervisor.  If the latter, his statements contradict those of the designated 30(b)(6) witness.   The submission of these affidavits appear to be an attempt to cure the 30(b)(6) deposition testimony that fails to satisfy the company's burden of proof.  *See*

*McKennon*, 513 U.S. at 362−63.  It is a well-established principle that a party cannot "defeat[ ] summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony."  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014).  Therefore, summary judgment is granted for Chen.  This ruling does not preclude Triumph from using the evidence for other purposes at trial should the evidence be admissible on other grounds.

IV.    **CONCLUSION**

For the above reasons, the Court DENIES Defendant's Motion for Summary Judgment and GRANTS Plaintiff's Motion for Summary Judgment.  The Court refers this case for settlement conference with a magistrate judge.

IT IS SO ORDERED

_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 30, 2023